MALCHMAN (Nathan), Frieda Lederer
and Gerta C. Conway

v.

DAVIS (Leonard), Sophie Davis, Colonial Penn Group, Inc., Colonial Penn Franklin Insurance Company, Intramerica Life Insurance Company, National Association Plans, Inc., American Association of Retired Persons, Carrie B. Allen, Oranda Bangsberg, Bernard Berggren, June Biggar, Arthur Bouton, Mamie R. Capellen, Verna A. Carley, French E. Dennison, Fred Faassen, Jerry P. Johnson, Olaf Kaasa, Clara L. Kleweno, George W. Schluderberg, Floyd E. Tumbleson, Kenneth J. Waite, Alice Van Landingham, J. Leonard Johnson, Melvin Thompson, C.E. Carmichael, Francis C. Seely, Harriet Miller, American Association of Retired Persons Insurance Trust, Dorothy M. Crippen, Edward J. Wenig, James J. Browning, Arthur Schuettner, Lloyd I. Singer, Cyril F. Brickfield and John J. MacWilliams.

No. 77 Civ. 5151.

United States District Court,
S.D. New York.

June 8, 1984.

Shea & Gould by Michael Lesch, Fran M. Jacobs, Kaufman, Malchman & Kirby by Stanley L. Kaufman, Irving Malchman, New York City, for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison by Sidney S. Rosdeitcher, Jeffrey C. Slade, Washington, D.C., for Colonial Penn Group defendants.

Kramer, Levin, Nessen, Kamin & Frankel by Geoffrey M. Kalmus, Michael S. Oberman, New York City, for Ass'n defendants.

Yablonski, Both & Edelman by Joseph A. Yablonski, Daniel B. Edelman, Washington, D.C., Phillip Hirschkop, Alexandria, Va., Sugarman & Denworth by Robert J. Sugarman, Philadelphia, Pa., for objectors.

GRIESA, District Judge.

On May 2, 1983 the Second Circuit reversed and remanded this court's approval of the settlement in this action and approval of counsel fees. *Malchman v. Davis*, 706 F.2d 426 (2d Cir.1983).

Upon reconsideration in light of the remand, the court determines that the settlement is fair and reasonable and that plaintiffs' counsel are entitled to attorneys' fees and disbursements of $2.325 million.

## FACTS

The background facts are well summarized in the Court of Appeals opinion as follows:

This litigation and the companion state court action, *Conway v. Davis*, No. 10535/76 (N.Y.Sup.Ct., N.Y.Cty.), principally arise from the relationship between Leonard Davis and various corporate entities owned or controlled by him and two nonprofit organizations of elderly persons, the National Retired Teachers Association (NRTA) and the American Association of Retired Persons (AARP).

Dr. Ethel Percy Andrus, a retired California high school principal, founded the NRTA in 1947 to promote the interests of retired teachers. In 1956, at Dr. Andrus's request, insurance broker Leonard Davis persuaded a national insurance company to underwrite a voluntary group health insurance program for the members of NRTA. In 1958, again with Davis's help, Dr. Andrus formed the AARP to serve the interests of Americans over 55 years old. AARP offered voluntary group health insurance to its

members similar to NRTA's. Since their founding, the two associations have attracted millions of members and presently have, between them, over 13 million members throughout the United States. Meanwhile, Davis formed the companies that in time became Colonial Penn Group (CPG) to underwrite health insurance policies in group plans and to provide other services to the associations' members. From 1958 on Davis and his companies managed the AARP and NRTA insurance plans. The associations encouraged their members to purchase insurance, travel and other products and services exclusively through Davis-controlled entities, including insurance subsidiaries, group travel companies, and employment agencies. Davis's entities, moreover, had the exclusive right to advertise in the associations' publications and were permitted to do so at what appears to be substantially less than the fair market value of such advertising. CPG also maintained the membership lists of the associations in its computers.

As AARP and NRTA grew, so did Colonial Penn and its various subsidiaries, its total revenues being $171 million in 1972 and $445 million in 1976. The AARP/NRTA health insurance plans generated over $261 million in premiums in 1977. As of January 1, 1976, CPG led 929 major United States corporations in profitability with a five-year average annual return on capital of 33.5% a figure nearly double the profitability of either IBM or Xerox and three times greater than the median return of 11.3% for the entire insurance industry.

706 F.2d at 427–28.

This litigation was commenced initially in Supreme Court, New York County on May 4, 1976. The complaint was filed on behalf of *Frieda Lederer* as representative of the class of AARP members who had purchased group health insurance from CPG on AARP's recommendation. At a subsequent time, Frieda Lederer died and other named plaintiffs were added. The suit was against CPG, Davis and other defendants. The complaint sought injunctive relief only

and no damages. The original counsel for plaintiffs was the law firm then known as Kaufman, Taylor, Kimmel & Miller (presently Kaufman Malchman & Kirby). Defendants promptly moved to dismiss the complaint. While the motion was pending, the firm then known as Shea, Gould, Clemenko & Casey (now Shea & Gould) appeared as co-counsel for plaintiff. The original complaint was dismissed upon consent with leave to replead. An amended complaint was filed in the state court action in July 1977. Gerta Conway was named as an additional plaintiff, and the state court action thereafter carried the name *Conway v. Davis.* The amended complaint alleged that defendants had committed fraud and breach of fiduciary duty in arranging with CPG for group health insurance and other services to be offered to AARP members. The amended complaint alleged that AARP had entered into improper arrangements with CPG, and had failed to select independently a group health insurance carrier and purveyors of other services which would be recommended by AARP.

In October 1977 Lederer and Conway, joined by Nathan Malchman, commenced the federal court action. It was brought as a class action under the federal antitrust laws. The class, as described in the complaint, consisted of the insurance-buying members of AARP. The federal action was basically the same as the state action, except that the federal action was based on the antitrust theory.

Between November 1977 and May 1978 there was motion practice in the state court action. Defendants' attempt to dismiss the action was unsuccessful, and defendants served their answers in the state court action in June 1978.

Discovery commenced in the state action on June 12, 1978 when defendants served interrogatories and document requests. In July 1978 plaintiffs served document requests. In response to the mutual document requests, plaintiffs produced over 4,000 pages of documents and defendants

produced over 100,000 pages of documents, of which plaintiffs made copies of over 65,000 pages.[1] Plaintiffs also filed lengthy answers to interrogatories.

The parties chose, for good and sufficient reason, to conduct almost all their discovery in the state court action. It is easy to understand why this was so. The litigation originated in the state court. Moreover, motion practice directed to the sufficiency of the complaint was completed early in the proceedings. There was no question of the jurisdiction of the state court over the fraud and breach of fiduciary duty claims, as there was in the federal court action, where subject-matter jurisdiction was seriously challenged, as will be described later in this opinion. In any event, it was understood that the state court discovery would be used in the federal court action.[2]

Depositions in the state court action commenced in January 1979. Plaintiffs deposed fourteen persons. Defendants deposed four persons. These depositions were conducted through mid-May 1980. There were sixty-six days of testimony resulting in 11,850 pages of transcript. There were numerous disputes during the discovery resulting in applications to the state court.

Plaintiffs moved in the state court action on January 8, 1979 for an order certifying the class. Defendants objected on the ground that they had not completed discovery on the adequacy of the representatives. On February 15, 1979 it was stipulated in the state court action to withdraw the motion for class certification until further discovery had been completed.

To return to the federal action, on August 11, 1978 a motion was filed to dismiss the federal complaint on the grounds that the action was barred by § 2(b) of the McCarran-Ferguson Act, 15 U.S.C.

§ 1012(b), and that plaintiffs lacked standing to assert the antitrust claims. Extensive briefs were filed on this motion. The questions presented were of considerable difficulty. The court requested further submissions and stipulations of fact. This additional work was completed in April 1980.

By the spring of 1980 serious settlement negotiations were taking place. One immediate result of this was that on June 16, 1980 the parties requested the federal court to withhold decision of plaintiffs' motion to dismiss.

The following events relating to the ultimate settlement of the action occurred. In February 1979 AARP and NRTA both passed a series of resolutions which provided for the discontinuance of their endorsement of certain CPG products *other than* group health insurance, and authorized a study of health insurance programs to determine whether the Associations' arrangement for group health insurance with CPG should continue after the then current term expired in June 1981.

In January 1980 the Associations decided to initiate a competitive bidding process to determine who would underwrite the group health insurance programs after June 1981. On September 1, 1980 the Associations signed an agreement with CPG. At least one of the purposes of this agreement was to provide for the transition from CPG to another insurer in the event that CPG was not selected for the health insurance programs commencing in July 1981. The agreement provided in detail for transitional arrangements in the event a new carrier was chosen and provided for uninterrupted coverage for insured Association members. It also provided that CPG would transfer the custody and maintenance of the Associ-

---

**1.** The Court of Appeals, after referring to defendants' request for documents, states, "As of early 1979, plaintiffs had obtained little or no discovery information from defendants." 706 F.2d at 429. The Court of Appeals omits reference to the 100,000 pages of documents obtained by plaintiffs from defendants thereafter.

**2.** The Court of Appeals states, "No discovery at all was undertaken by plaintiffs in this [the federal] action." 706 F.2d at 429. As noted in the text, the state court discovery was intended to apply in both actions.

ations' membership lists to the Associations.

Another feature of the September 1, 1980 agreement was that CPG would pay the Associations a total of $6,866,664 and would spend not less than $4.5 million to promote membership in the Associations for the period through June 30, 1981.

A Stipulation of Settlement regarding the state and federal actions was entered into on November 3, 1980. This is the settlement agreement which is before the court. The stipulation provided that:

1. The Associations would not enter into a contract with any insurance carrier to underwrite their group health insurance programs for the period from July 1, 1981 except through the request for proposals procedure initiated in early 1980.

2. The selection of any group health insurance carrier would be made by the boards of directors of the Associations in consultation with the trustees of the AARP and NRTA insurance plans. The boards of directors would consider, among other factors, premium levels, claim service and marketing abilities which would be most advantageous for the members of the Association.

3. The trustees of the insurance plans would serve for periods not exceeding six years and would be solely responsible to the boards of directors of the Associations.

4. The Associations would accept advertising for their magazines and news bulletins from any party at the prevailing rate schedule, subject to limitations which the boards of directors of the Associations might impose with regard to the appropriateness of the subject matter. Such limitations could not restrict advertising to the products and services of one advertiser.

5. Not later than July 1, 1981 the Associations would obtain new data processing and new membership promotion services, previously provided by CPG.

6. Honorary Presidents (one of whom is Leonard Davis) would attend board of directors and executive committee meetings only upon specific invitation, and would not attend any meeting at which the endorsement of any product or service by the Associations was to be considered.

7. No officer or director of CPG, other than the current Honorary Presidents, would be permitted to attend any board of directors or executive committee meeting except upon special invitation and for the limited purpose of presenting information.

8. No officer or director of CPG, other than the current Honorary Presidents, would hold any position in the Association.

9. In the event that the boards of directors of the Associations determined to endorse or recommend products or services in addition to group health insurance, the Associations would not limit their endorsements solely to the products and services of one vendor.

These provisions to some extent confirmed the resolutions of February 1979 and other steps by the Associations leading up to the agreement of September 1, 1980. To some extent the Stipulation went further, as in the provisions ensuring the independence of the Associations from CPG influence. However, it is obvious that the vigorous prosecution of these lawsuits was the principal cause, if not the sole cause, of the revisions in practices carried out by the Associations commencing in February 1979.

The Stipulation of Settlement contains certain additional terms relating to the disposition of the litigation. It was agreed that the plaintiff class would be expanded from insurance-buying members of AARP to all persons who were members of AARP or NRTA as of November 1, 1980. This agreement was to apply to both the state and federal actions. NRTA was to be added as a defendant in both actions. Plaintiffs' counsel were to apply to the state court for fees and disbursements not exceeding $2.325 million, the first $1 million of which was to be paid 90% by CPG and

10% by the Associations, the excess over $1 million was to be paid 70% by CPG and 30% by the Associations. The agreement provided that defendants could withdraw from the settlement if more than 10,000 class members opted out of the class and sought monetary relief.

The Stipulation of Settlement contains a broad provision barring claims by members of the class, either on behalf of the class or derivatively on behalf of the Associations.

In the state action, Peter Johnson was appointed referee to report on the fairness of the settlement agreement. Referee Johnson held hearings commencing in January 1981 and continuing through April 1981. On May 27, 1981 the referee filed his report recommending approval of the settlement and recommending an award of fee and disbursements of $2.325 million. The justice who will rule on the matter in the state court is Justice Israel Rubin. The matter is still under submission before him.

On June 19, 1981 the federal district court entered an order conditionally certifying the class as described in the Stipulation of Settlement. Notice of hearing on the settlement and fee application was given. Hearings were held, resulting in the ruling and judgment approving the settlement and approving the award of fee and disbursements in the amount of $2.325 million. The judgment was entered on September 10, 1982. This led to the appeal and the Second Circuit decision of May 2, 1983 remanding the matter for further consideration.

The plaintiff class, as originally defined, consisted of about 2.5 million persons. The plaintiff class as expanded by the Stipulation of Settlement consists of about 11 million persons. The number of persons who have opted out of the class is 2,850. The number of persons who have objected to the settlement is 11.

### Discussion
### Fairness of Settlement

As the concurring opinion of Judge Newman in the Court of Appeals points out:

In this context the lawsuits were settled on terms that provide the plaintiffs with virtually all of the relief they sought in their complaints. The settlement proposes to secure in an enforceable consent judgment not only the contractual rights inuring to the Associations by virtue of their 1980 agreement with CPG, but also the very important additional requirement that the Associations will invite competitive bidding for the opportunity to provide health insurance for their members.

706 F.2d at 436.

■ It is difficult to overstate the far-reaching results of this litigation and the settlement. Relationships between the Associations and CPG which had existed for more than 20 years came to an end. The value of those relationships is only partly indicated by the figure of $261 million for health insurance premiums paid by AARP/NRTA members in 1977, the year the federal action was commenced. It was hotly debated in the course of the litigation whether the arrangements between the Associations and CPG were as favorable to the Associations and their members as they should have been. However, one thing is clear. The attack mounted by plaintiffs succeeded. The Associations have broken virtually all ties to CPG, and group health insurance contracts and other business dealings are now dealt with by CPG on an open competitive basis. Prudential Insurance Company has replaced CPG as the group health insurer. Few class actions have ever succeeded in altering commercial relationships of such magnitude. Few class actions settlements have even approached the results achieved here.

The only question relating to the fairness of the settlement arises from the fact that damage claims were not pleaded in either the state or the federal action, but that nevertheless they are sought to be barred in the settlement. Since we are only concerned with the federal action, the only damage claims which need to be dealt with are antitrust damage claims on behalf of the class and derivative antitrust claims on

behalf of the Associations. It is the conclusion of the court that it was entirely fair and reasonable for the settlement agreement to provide that such damage claims would be barred.

As to the antitrust claims on behalf of the class, what is referred to is possible claims for premium "overcharges" under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The relevant damage provision is contained in § 4 of the Clayton Act, 15 U.S.C. § 15.

On the merits of these claims the issues fall into two categories. *First*, there are the issues relating to liability. In this regard, the same issues which pertain to the injunction claim would pertain to any claims for damages. *Second*, there are the damage issues themselves, particularly in regard to the difficulties of proof for so large a class.

In regard to liability, defendants presented a serious motion under § 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b). Aside from the issues raised on that motion, there were other substantial questions. With regard to Sherman Act § 1, we start with the proposition that there was nothing illegal about the Associations having an exclusive contract with one insurance company to provide group health insurance to the members. Plaintiffs' challenge under § 1 was to the relationship between CPG and the Associations which, in plaintiffs' view, prevented a selection procedure open to competition by other insurance companies. Plaintiffs claimed that this was an unreasonable restraint affecting a sufficient amount of commerce to constitute a violation of § 1. Defendants contended that there was nothing unlawful about the selection procedure, but if there was, this was nothing but a breach of fiduciary duty under state law and not a § 1 violation. Defendants also contended that there was no restraint of trade of any significance. Among other things, defendants pointed to the fact that only one-fourth of the members of the Associations purchased health insurance from CPG, and that more members purchased such insurance from other carriers than they did from CPG. As to the Sherman Act § 2 claim, it is sufficient to say that there is serious doubt about the ability of plaintiffs to demonstrate monopolization of a market in which numerous large insurers participate.

What has been said is a capsule description of the various factual and legal issues which would have been fought out if the federal court action had been litigated to the end. It is clear that the issues were difficult and that one cannot say with any degree of certainty what the outcome would have been. There was ample justification for a settlement.

It is worth returning now to a point noted earlier—the relationship of the state court action and the federal court action. As already described, the parties conducted their discovery in the state court action, and the various disputes about discovery were dealt with in the state court. Moreover, the submission of the settlement and the fee application was made in the first instance to the state court referee. In view of the numerous problems with plaintiffs' federal antitrust claims, it is reasonable to assume that the state court claims had a better chance of success than the federal court claims. In any event, the parties apparently viewed the state court as the more important situs of the litigation.

We now come to the damage issues. The federal action was commenced in 1977. If damages had been claimed, the four-year antitrust statute of limitations would have permitted claims going back to 1973. If we assume a trial in 1980 or thereafter and the filing of supplemental complaints, this would allow a total period of seven years or more for antitrust damage claims. As already noted, the expanded class as defined by the stipulation of settlement consists of 11 million persons. The number of insurance-buying members of the class (potential damage claimants) would be at least 2½ million and possibly substantially more. The measure of damages would be how much the claimant has been "injured in his

business or property." 15 U.S.C. § 15. That amount would, of course, be trebled. The specific question on antitrust claims by members of the class would have been: How much more were they charged in premiums by CPG than they would have been charged by some other company, or by CPG, selected in an open competitive market?

During the relevant period there were 17 different AARP plans and 9 NRTA plans. These plans were amended at various times. It would have been necessary to determine whether a particular coverage could have been obtained at a lower price under different competitive conditions.

One can be reasonably sure that the trial of such claims would not have literally involved a separate hearing for each of the claimants. Undoubtedly, there could have been the formation of sub-classes. However, it would seem that the number of sub-classes would not be small, but would surely be some multiple of the number of plans (26).

Aside from the difficulties of proof, the various tasks involved in processing and administering the great number of potential claims would involve great effort and expense.

This brings us to the value of the claims. In terms of individual claims (and this is the only proper measurement) this would be minimal. Most of the premiums paid by AARP/NRTA members to CPG ran between $4.50 and $9.75 per month. The so-called "overcharges", if they could be proved at all, would be some relatively small percentage of these monthly premiums. One of plaintiffs' attorneys has estimated in an affidavit that the individual damage recoveries would likely be less than $100. There has never been any challenge to this estimate, and it appears to be quite realistic.

One rough test of its validity appears from the following. Counsel for the Associations have advised the court that the new arrangement with Prudential involves a reduction of premiums on some policies, although on many policies the premiums are as before. Prudential has agreed to a fixed 75%·loss ratio (the ratio of benefits to premiums), and has agreed to set aside any difference between that ratio and any lower ratio into a reserve fund for the future benefit of policyholders. In effect, what Prudential has done is to make a reduction in premiums to some policyholders, but largely await experience to see if there should be any broader reduction in premiums or any increase in benefits. In any event, the estimate is that, where premiums have been reduced, the reduction is about 10%.

No one believes that this 10% reduction is any appropriate measure of what antitrust damages would be for persons who bought insurance from CPG. However, it is perhaps some rough indication of the possible range of antitrust damage claims. For instance, if we assume that a person who was paying $9.00 per month would have been able to purchase from another company at 10% less—we have damages of $.90 per month. Trebled, that gives an amount of $2.70 per month. This gives antitrust damages at the rate of $32.40 per year. If we realize that the 10% is probably generous, and that the $9.00 represents the higher end of the premiums, it becomes apparent that the antitrust damages, if they could be proved at all, would be something considerably less than $32.40 per year.

This is obviously a situation where the value of damage claims would be so small as to be virtually meaningless to the purported "beneficiaries." When the value of these claims is viewed in the context of the various questions of antitrust liability and the difficulties in proving damages and administering the claims, it becomes clear that it was sound judgment by plaintiffs not to assert them in the complaint, and it was salutary for the settlement to bar them, particularly in view of the outstanding results achieved in the settlement by way of prospective relief.

The statement in *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005, 1017 (2d Cir. 1973)[3], applies in the present case:

> The fact that the cost of obtaining proofs of claim by individual members of the class and processing such claims was such as to make it clear that the amounts payable to individual claimants would be so low as to be negligible also should have been enough of itself to warrant dismissal as a class action.[4]

The Court of Appeals in the present case suggests, however, certain alternative theories of damages for consideration. One of these is the possibility that "means may be available to assess the harm to the class even if proof of each of plaintiff's damages would be difficult." 706 F.2d at 435. With all due respect, it must be stated that this suggestion is not in accordance with the law of damages in antitrust cases.

Rule 23, providing for class actions, does not "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072. Rule 23 cannot be used as a device for departing from the statutory requirement that antitrust damages may be recovered only by a "person who shall be injured in his business or property" by reason of the antitrust violation. 15 U.S.C. § 15. The claims of many cannot be treated collectively or as the claim of "the class as a whole." *Eisen v. Carlisle & Jacquelin, supra* at 1014, 1018. In *In re Hotel Telephone Charges,* 500 F.2d 86, 90 (9th Cir.1974), the Ninth Circuit stated:

We agree with the decision reached in *Eisen v. Carlisle & Jacquelin* ... that allowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes.

Another suggestion by the Court of Appeals in the present case is

> ... the possibility that plaintiffs' loss could be measured as CPG's excess gain, *see Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 802 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), a possibility that cannot be dismissed or simply overlooked in light of the statements in plaintiffs' counsels' affidavit that CPG's arrangement with the associations was very profitable, that "the opening of competitive bidding for the Associations' $270 million annual group health insurance has resulted in increasing the cash payout of group health insurance benefits to class members by over $39 million per annum" and that opening the associations' publications to other advertisers will increase advertising revenues by "over $19 million" in "the next five years alone."

706 F.2d at 435.

It should be noted that *Zeller* was neither a class action nor an antitrust case; it was a derivative action brought under the federal securities laws and certain common law theories. However, these distinctions, while of interest, are not crucial for present purposes. The Court of Appeals in

**3.** This decision was reviewed by the Supreme Court, which agreed with the Court of Appeals that the class action as defined in the complaint should be dismissed, although the Supreme Court opinion dealt only with the question of notice, and did not deal with the other points discussed in the Court of Appeals opinion. 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The literal order of the Supreme Court was:

> We therefore remand the cause with instructions to dismiss the class action as so defined.
> The judgment of the Court of Appeals is vacated and the cause remanded for proceedings consistent with this opinion.

417 U.S. at 179, 94 S.Ct. at 2153. Perhaps the reason for this order was that the Court of Appeals had dismissed the class action without prejudice to the action of the individual plaintiff

(479 F.2d at 1020), whereas the Supreme Court dismissed the class action without prejudice to plaintiff moving to redefine the class (417 U.S. at 179 n. 16, 94 S.Ct. at 2153 n. 16).

**4.** The present case is not, of course, being dismissed as a class action. The Stipulation of Settlement provides for class action certification and defines the class. For reasons stated later in this opinion, the court is of the view that this certification is appropriate and serves a valid purpose. But the question remains as to what are fair and reasonable terms for the settlement of the class action. The utility of the *Eisen* quotation, for purposes of the present case, is that it supports the view that waiver of potential damage claims is fair and reasonable in view of their minimal value.

*Malchman* cited *Zeller* for the theory of damages that a plaintiff's loss may at times be measured by a defendant's "excess gain." This is, of course, perfectly true. If a defendant has defrauded a plaintiff out of certain property and has received that property, the plaintiff's damages may be equal to the defendant's gain; and there may be times when it is useful to measure the gain to the defendant in order to fix the amount of the plaintiff's damages. A situation such as this was discussed in *Zeller*. The claim there was that one corporation (Bogue) had improperly caused an affiliated corporation (Belco) to make a loan to Bogue at rates unduly favorable to Bogue. Thus it was claimed that Belco had lost the additional return which it could have earned by lending the money elsewhere, and Bogue had improperly benefited by obtaining the loan on the terms which were too favorable to it. The Court of Appeals discussed what it termed two theories of damages—the loss to Belco and the improper benefit to Bogue. The court stated that in practical effect, the second theory was "the mirror image of the first." 476 F.2d at 802. However, the court stressed the need for the plaintiff to prove that Belco could have found a borrower willing to pay a greater rate of interest than had been paid by Bogue. The dismissal of the case on motion was reversed.

*Zeller* authorizes no departure from the normal rule of damages in antitrust class actions. Indeed, the statement in *Zeller* about the plaintiff being required to prove availability of another borrower who would provide a greater return, is quite similar to what would be the necessity for the class claimants in the present case to show— *i.e.,* that they could have obtained their health insurance at more favorable rates from some other source under more competitive conditions.

The Court of Appeals in the present case also suggests that an increased "cash payout" to Association members of over $39 million per year, and increased advertising revenues to the Associations of over $19 million in the next five years, might provide measures of damages. The $19 mil-

lion item will be discussed later in connection with possible derivative damages to the Associations. It has no bearing upon possible damage claims by class members. This leaves for discussion the $39 million item.

The fact is that this figure has virtually no bearing upon the question of antitrust damages by class claimants. As noted earlier, Prudential has committed itself to a loss ratio of 75%, and has agreed that any difference between this 75% loss ratio and any lower loss ratio which may occur will be put into a reserve fund for the benefit of policyholders. In attempting to quantify the benefit which would thus accrue to the policyholders, plaintiffs' counsel has estimated that the difference between the 75% Prudential loss ratio and an average CPG loss ratio in the past is 14.6%. Applying this percentage to a figure of $270 million, representing premiums paid by Association members in 1979, would produce a figure of $39 million.

There are several reasons why this calculation is of little or no use in dealing with the question of antitrust damages to class claimants. *First,* the purpose of the calculation is to try to convey an idea of the value of the *prospective* benefits to the class from the settlement. *Second,* although perhaps useful for this purpose, it is only the roughest kind of estimate even of such prospective benefits. As to what Prudential's loss ratio would be for the years after 1981, this remains to be seen. *Third,* whatever Prudential's loss ratio is in the years after 1981, there is no assurance whatever that this would be helpful in measuring what Association members would have paid in premiums in earlier years, going back to 1973, to Prudential or other companies under the competitive conditions which plaintiffs urge should have obtained. *Fourth,* it must be remembered that the antitrust laws do not provide for damages on an unjust enrichment theory. Injury to the plaintiff's business or property must be proved. *In re Hotel Telephone Charges,* 500 F.2d 86, 92 (9th Cir.1974); *Wilson P. Abraham Construction Corp. v. Texas In-*

*dustries, Inc.* 604 F.2d 897, 900 n. 5 (5th Cir.1979), *aff'd,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). *Fifth,* the reference by the Court of Appeals in the *Malchman* opinion to the $39 million figure appears to be closely related to the suggestion of dealing with the "harm to the class." As already stated, this approach is contrary to the law of antitrust damages.

The Court of Appeals requested consideration of the case of *Copitka v. Colonial Penn Group, Inc.,* No. 442574 (Cal.Super. Ct., San Diego Cty., 1979). This was an action brought by an AARP member and his wife against CPG in a California state court under California law. The case is irrelevant to the issues in the present federal antitrust class action. The California case involved a claim that CPG improperly failed to reimburse more than a small percentage of certain large hospital bills. Compensatory and punitive damages were claimed. The case was settled for $500,-000. The case did not involve claims for alleged overcharges in premiums.

Upon consideration of the matters referred to by the Court of Appeals in the present case, this court still concludes that it was entirely reasonable for the settlement agreement to bar damage claims on behalf of the class as part of the consideration for the settlement. One additional factor which should be noted is that only the smallest handful of persons has objected. Moreover, there has been ample opportunity for the objectors or the persons opting out to bring actions seeking antitrust damages. No such action has been brought.

The question of derivative damages can be dealt with briefly. This brings us back to the $19 million in advertising revenues referred to in the Court of Appeals opinion, as being an estimate of one of the benefits of the settlement over a period of five years. This, of course, refers to benefit to the Associations, and there is a suggestion that this is some measure of damage to the Associations caused by the alleged antitrust violations. Again, there has been ample opportunity for the objectors or the persons opting out to bring such a deriva-

tive action. None has been brought, and for good reason. Under New York Not-For-Profit Corporation Law § 623(a), a derivative action on behalf of associations such as these must be brought by at least 5% of any class of members. There is no indication that any such proportion of the members of the Associations has any interest in bringing such a derivative action. *Representation.*

The Court of Appeals directed that the question of the adequacy of representation be further considered on remand.

Objectors contend that the named plaintiffs are inadequate representatives because of their relationship to class counsel. Plaintiff Nathan Malchman is the brother of class co-counsel Irving Malchman. Plaintiff Conway is the sister of the chauffeur of Milton Gould, a senior partner of Shea & Gould. Plaintiff Louis Stone is a personal friend of class co-counsel Stanley Kaufman. *See* 706 F.2d at 432.

There is some authority for the argument that a plaintiff who is a close relative of the attorney may be disqualified as a representative of the class. The theory is that such a relationship may result in an improper settlement. *See Sussman v. Lincoln American Corp.,* 561 F.2d 86, 90–91 (7th Cir.1977). In that case class action status was denied because plaintiff was the brother of the attorney. However in *Fischer v. ITT,* 72 F.R.D. 170 (E.D.N.Y. 1976), the court allowed a class action to proceed where the plaintiff was the father of the attorney. The court analyzed the cases and found that the "touchstone" for denial of class action status was the question of whether the plaintiff had an interest in the attorney's fee.

■ There is no indication that any of the plaintiffs in the present litigation have an interest in the attorneys' fees or that plaintiffs have acted in any manner other than as normal and proper plaintiffs in a class action. Moreover, one of plaintiffs is William Deautriell, a former AARP chapter head, who has no relationship with any of plaintiffs' attorneys.

It is, of course, a matter of common experience in class actions that the named plaintiffs are often people of very little sophistication in financial or legal matters. It is almost always the attorneys who make the litigation decisions, determine strategy, and negotiate settlement terms. In practical fact, the quality of the attorneys is frequently the most important factor in determining the quality of representation. *See Shaffery v. Winters,* 72 F.R.D. 191, 193 (S.D.N.Y.1976).

In the present case, the attorneys representing the class have acted with outstanding vigor and dedication. When the litigation began, the class was represented by the firm of Kaufman, Taylor, Kimmel & Miller. The Kaufman firm brought in Shea, Gould to have the full litigating resources of a large firm. Shea, Gould was clearly not brought into the case for the purpose of achieving some quick settlement, but because of the desire to litigate these complex actions with all possible strength.

Although the lawyers in this litigation have appeared considerably more in the state courts than in the federal court, they have appeared in the federal court sufficiently for me to attest as to the high professional character of their work. Every issue which has come to this court has been presented by both sides with a thoroughness and zeal which has been outstanding. There has never been the slightest hint in the conduct of plaintiffs' attorneys that they were willing to sacrifice legitimate claims for an easy settlement.

In considering the vigor of their representation, it must be recognized that plaintiffs' attorneys had the responsibility of determining what claims were worth pursuing and what were not. As described earlier, they sued for injunctive relief and not for damages. It is clear from the objective facts that this was a sound decision. When it came to the settlement agreement, it hardly needs to be said that a 100% victory on the claims sued upon speaks clearly for the vigor of the advocacy. For reasons already set forth, the agreement to waive damage claims gave up nothing of any substantial value.

Another point made by objectors is that, even if plaintiffs were capable of representing the class as originally defined, they cannot properly represent the class as expanded in the settlement agreement. As stated earlier, the class described in the original complaint consisted of those members of AARP who had purchased health insurance from CPG. At the time of the settlement it was agreed that the class would be expanded to include all AARP members (including those who had not purchased CPG insurance) as well as all NRTA members. A group called "AIM" was also included, but this was merely part of AARP.

With regard to the claims for injunctive relief, which were the subject matter of the actions, the interests of the persons added to the class in the settlement were the same as the interests of the original class members. To the extent that it is beneficial to have the health insurance carrier selected by competitive bidding, this is beneficial to all members of AARP and NRTA.

It is true, of course, that the class was expanded in the settlement largely to give defendants the maximum protection against further litigation regarding the issues raised in these actions. This was a perfectly reasonable objective. It goes without saying that no purpose would be served by having further litigation on the claims for injunctive relief, in view of what was achieved in the settlement. As to possible damage claims by the class members, the class as originally defined had a *greater* interest in such claims than most of the new class members, and could fairly waive these claims without incurring any conflict with the new class members (most of whom had no damage claims to waive, since they had not purchased insurance from CPG). As to derivative claims, the interests of all members of AARP and NRTA were identical, and plaintiffs could fairly represent all these persons in the settlement.

*Fee Application.*

The Stipulation of Settlement provides that plaintiffs' attorneys would apply for approval of fee and disbursements not to exceed $2.325 million and that defendants would not oppose such an application. It was further agreed that of the first $1 million awarded, CPG would pay 90% and the Associations would pay 10%, and of any remaining award, CPG would pay 70% and the Associations 30%. If the full $2.325 million is awarded, CPG will pay $1,827,500 and the Associations will pay $497,500.

■ Certain circumstances should be noted at the outset. It is of some significance that the bulk of the fee will be paid by CPG. This does not mean that such a payment is beyond the scrutiny of the court. However, the payment by CPG to plaintiffs' attorneys is not being deducted from any settlement fund payable to the class, nor do the circumstances suggest any collusion by CPG and plaintiffs' attorneys to arrange for an improper settlement. Even if one were to consider that the amount being paid by CPG constituted some kind of a settlement fund, it would amount to only a few cents per class member. It should also be kept in mind that the fee application is made both to the federal and the state courts. Approval of the $2.325 million fee request has been recommended by the state court referee. It would seem clear that the orderly administration of justice would require that some deference be given to the proceedings in the state court. Most of the attorneys' work was carried out in the state court action. Also, for reasons already stated, the parties appear to have regarded the state court as the more important situs of the litigation.

Nevertheless, the Court of Appeals has directed that an independent review be made in the federal court regarding the fee application. This has been done. The $2.325 million applied for includes $2,085,901 for fee and $239,098 for disbursements and paralegal expenses. The time records for Shea & Gould and Kaufman Malchman & Kirby show a total of 10,282.75 hours spent on this litigation through August 31, 1981. The great bulk of this time was spent prior to the settlement agreement of November 3, 1980, although a modest amount of time (945 hours) was spent in proceedings thereafter relating to submission of the settlement and the fee application to the state and federal courts. At Shea & Gould, most of the partner time was spent by Michael Lesch. His normal hourly rate during the time of the litigation was $135–150. At the Kaufman Malchman firm, substantial amounts of time were spent by Stanley L. Kaufman and Irving Malchman, whose hourly rates were $200 and $150 respectively. At Shea & Gould there were a few other partners besides Mr. Lesch, and a number of associates, who worked on the case. The hourly rates for the attorneys at these firms, both partners and associates, are entirely reasonable. The amount arrived at by taking the number of hours multiplied by the normal hourly rates is $1,237,412. The fee requested ($2,085,901) is 1.685 times $1,237,412.

Objectors have singled out three instances of what they claim was wasted or duplicated effort. These involve a relatively small number of hours, and the criticisms are unwarranted. Objectors also contend that there should be no allowance for a total of about 1,150 hours spent after May 1, 1980 when it is alleged that the "agreement in principle" to settle was reached. However, the record shows that negotiations and other work, normally used as a basis for a fee application in a class action, continued after the May 1, 1980 date.

Even if all the time complained about by objectors is taken out, the number of hours multiplied by the regular rates would equal about $1 million. Based on this amount, the multiplier necessary to arrive at the requested fee of $2,085,901 is 2 and a small fraction.

Either the multiplier of 1.685 or the multiplier of 2 is well within what has been used in connection with antitrust class action fee awards. *See, e.g., In re Gas Meters Antitrust Litigation,* 500 F.Supp. 956

(E.D.Pa.1980) (multiplier of two and one half); *In re Gypsum Antitrust Cases,* 1974–2 Trade Cases (C.C.H.) ¶ 75,272 (N.D. Cal.1974), *aff'd,* 565 F.2d 1123 (9th Cir. 1977) (multiplier of three).

The Court of Appeals asked six questions (706 F.2d at 435–36), the answers to which should be clear from what has been stated. Nevertheless, they will be specifically addressed.

> Why was a bonus awarded so large as to produce a total fee award that amounts to double the usual rates for counsel—for a total of approximately $240 per hour—regardless of the difficulty of the tasks performed?

> What difficulty was involved that was extraordinary?

The average hourly rate before applying the multiplier is $120. An examination of the time records shows that a large number of hours was spent, but the amount of work was not unreasonable in view of the scope and complexity of the litigation. Moreover, it appears that the tasks were apportioned among various attorneys of various degrees of seniority in the normal way—according to the difficulty of the particular project. Shea & Gould spent the greater amount of time—6,440.50 hours versus 3,842.25 hours for the Kaufman firm. Shea & Gould had a number of associates available to work at relatively low rates.

As to the size of the multiplier or bonus, it should be noted at the outset that the $240 figure referred to by the Court of Appeals appears to be incorrect. If the requested fee ($2,085,901) is divided by the number of hours (10,282.75) this gives an average rate of $203 per hour. More important, the multiplier of 1.685 would appear to be amply justified in light of the applicable standards. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1974).

This litigation was of unusual importance and magnitude, for the reasons already pointed out. As to the complexity of the issues, it would be inappropriate for the federal court to inquire into the degree of complexity of the state court issues. As to the federal antitrust issues, it is clear that they were numerous and complex. There was no prior judgment or decree in a Government case upon which plaintiffs could rely.

In sum, plaintiffs and their attorneys undertook a very large and difficult litigation in both the state and federal courts, where the stakes were enormous. This litigation was hard fought over a period of four years. Plaintiffs achieved a settlement which altered commercial relationships involving literally hundreds of millions of dollars. The multiplier of 1.685 and the requested $2,085,901 for fees are modest in view of all the circumstances. One of the factors justifying such a multiplier is the large investment of attorney labor without payment since 1976.

The next question of the Court of Appeals is:

> Why was all the time necessary for the mere pursuit of injunctive relief to which there was such rapid agreement in principle?

The answer is that there was no "rapid agreement in principle." The chronology of the litigation makes this clear.

The Court of Appeals further asks:

> Was the recital of the draft proposal of defendants to the effect that plaintiffs' counsel had researched the legal principles applied to damage claims dropped in the executed stipulation and, if so, why?

The answer is that the recital was not dropped. Paragraph O of the Stipulation of Settlement provides:

> Additionally, plaintiffs' counsel have studied the applicable legal principles underlying this litigation (including, but not limited to, the legal principles that would govern any possible damage claims and the assertion of such damage claims in a class action).

Another question is:

> Were the fees agreed upon before the settlement was reached or only after substantive issues were worked out?

It has been averred in affidavits by Michael Lesch, co-counsel for plaintiffs, Sidney Rosdeitcher, attorney for CPG, and Geoffrey Kalmus, attorney for the Associations, that the amount of the fee application was not negotiated or agreed upon until after the main substantive terms of the settlement were arrived at. These averments, viewed in the light of all the circumstances, appear entirely credible.

The final question asked by the Court of Appeals was:

> Why were the associations to pay any part of the bill since the gravamen of the complaints was that the associations (or their members) had lost money by virtue of CPG's actions?

It is settled law that attorneys' fees may be charged against the beneficiary of a class action. *See Kopet v. Esquire Realty Co.,* 523 F.2d 1005, 1008 (2d Cir.1975). In the present case, affidavits from the Associations make it clear that they were desirous of ending the litigation, because it was interfering with the conduct of the business of the Associations and was a cloud on their reputations. Their agreement to a modest contribution toward the attorneys' fees was entirely reasonable and lawful.

One further point should be dealt with, which bears upon the fee application as well as the fairness of the settlement. The Court of Appeals referred to what it termed "the CPG defendants' quick capitulation," 706 F.2d at 435, and appended the following footnote:

> 5. We do not intend to imply that quick settlements should be viewed with heightened suspicion; few cases will seek to dispose of the rights of so many persons who are not active participants in a suit on the basis of as little vigorous presettlement investigation of the merits of their claims as this one.

It is only just to say that these statements are inaccurate. The record demonstrates without question that there was a long and conscientious struggle by the attorneys for both plaintiffs and defendants to achieve an honorable and realistic disposition of this important case.

For the above reasons this court approves the application of plaintiffs' attorneys for an award of a fee in the amount of $2,085,901 and disbursements and paralegal expenses in the amount of $239,098 or a total of $2.325 million.

*Discovery.*

■ Objectors have contended, since the time of the remand, that they should be allowed to engage in discovery. However, such discovery is not warranted where the court has sufficient materials already before it to evaluate the settlement and fee application, and where the objectors have failed to make cogent factual objections which indicate the need for discovery and a possible evidentiary hearing. *See Weinberger v. Kendrick,* 698 F.2d 61, 74, 79 (2d Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). In the present case, a large record exists which is ample to permit decision on the relevant issues. There is no reason for permitting objectors to engage in discovery.

### Conclusion

This court approves the Stipulation of Settlement of this action, including the request by plaintiffs' attorneys for an award of attorneys' fee and disbursements of $2.325 million.

So ordered.