Nathan **MALCHMAN**, Gerta Conway, William Deautriell and Louis Stone, Plaintiffs-Appellees,

v.

Leonard **DAVIS**, Sophie Davis, Colonial Penn Group, Inc., Colonial Penn Franklin Insurance Company, Intramerica Life Insurance Company, National Association Plans, Inc., American Association of Retired Persons, National Retired Teachers Association, Carrie B. Allen, Oranda Bangsberg, Bernard Berggren, June Biggar, Arthur Bouton, Olaf Kaasa, Clara L. Kleweno, Floyd E. Tumbleson, J. Leonard Johnson, C.E. Carmichael, American Association of Retired Persons Insurance Trust, Dorothy M. Crippen, James J. Browning, Lloyd I. Singer, Cyril F. Brickfield and John J. MacWilliams, Defendants-Appellees,

Mountain Plains Congress of Senior Organizations, Mr. & Mrs. Hugh A. Groves, Francis Seely, Estelle Whittle, Henry Whittle, Mr. & Mrs. Burton W. Atkinson, Mr. & Mrs. C.E. Dietrich, Harriet Miller, and Alice Van Landingham, Objectors-Appellants.

Nos. 434, 576, Dockets 84–7589, 84–7669.

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1984.

Decided May 10, 1985.

Jon O. Newmann, Circuit Judge, concurred with opinion.

Mansfield, Circuit Judge, dissented with opinion.

Michael Lesch, New York City (Fran M. Jacobs, Shea & Gould, New York City, Stanley L. Kaufman, Irving Malchman, Kaufman Malchman & Kirby, New York City, of counsel), for plaintiffs-appellees.

Sidney S. Rosdeitcher, Washington, D.C. (Steve Gey, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., Jeffrey C. Slade, Meister Leventhal & Slade, New York City, of counsel), for Colonial Penn Group, Inc., and related defendants-appellees.

Geoffrey M. Kalmus, New York City (Michael S. Oberman, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for the Ass'n. defendants-appellees.

Joseph A. Yablonski, Washington, D.C. (Daniel B. Edelman, Yablonski, Both & Edelman, Washington, D.C., Phillip J. Hirschkop, Hirschkop & Grad, Alexandria, Va., Robert J. Sugarman, Sugarman, Denworth & Hellegers, Philadelphia, Pa., of counsel), for objectors-appellants.

Before MANSFIELD, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This approval of an antitrust class action settlement comes before us a second time. In *Malchman v. Davis*, 706 F.2d 426 (2d Cir.1983), we remanded approval of the settlement for further analysis of the adequacy of class representation and the adequacy, fairness, and reasonableness of the settlement itself—the latter with particular concern for the proposed award of attorneys' fees and costs in the amount of $2.325 million. Remand was ordered with the understanding that, while we were calling for "further analysis," we were not making "any attempt to circumscribe the permissible conclusions that the District Judge may reach upon completing his further consideration of the matter." *Id.* at 436 (Newman, J., concurring). On such further consideration, the district judge again concluded that the representation of the plaintiff class was adequate and the settlement, including attorneys' fees, was adequate, fair, and reasonable. *Malchman v. Davis*, 588 F.Supp. 1047 (S.D.N.Y.1984). We affirm. Familiarity with the opinion of this court on the prior appeal and the opinion of the district court after remand will be assumed, though we will briefly restate the case to illuminate what follows.

This litigation and a companion state court action, *Conway v. Davis*, No. 10535/76 (N.Y.Sup.Ct. filed May 4, 1976), principally arise from the relationship between insurance companies created and controlled by Leonard Davis and two non-profit retiree associations, the National Retired Teachers Association (NRTA) and the American Association of Retired Persons (AARP) (collectively the Associations). Some twenty years ago, Mr. Davis, an insurance broker, formed the companies that became Colonial Penn Group (CPG), an underwriter of group health insurance plans. From the 1960's until 1980, CPG became the first insurance company, and remained the only one, to underwrite health insurance policies for the members of the Associations. It also had the exclusive right to advertise in the Associations' publications, and, inter alia, maintained the membership lists of the Associations in its computers. The Associations in turn encouraged their members to purchase a variety of insurance products and services through CPG entities. Over twenty years of cooperation and mutual assistance between CPG and the Associations, together with numerous demographic factors, resulted in tremendous growth in the membership of the Associations and in CPG's profits. *See* 706 F.2d at 428. The arrangement had had many benefits to the parties even if it was a locked-in one.

In 1976, litigation commenced in state court in the form of a class action brought by Frieda Lederer on behalf of the class of insurance-buying members of the AARP, charging Davis, CPG, and others with fraud and breach of fiduciary duty and alleging, inter alia, that the class was overcharged for insurance policies purchased from CPG. A federal class action alleging antitrust liability was subsequently brought in October 1977, the class again consisting of the insurance-buying members of the AARP. Neither the state court nor the federal court action sought damages; rather, each sought injunctive relief to terminate the relationship between Leonard Davis and CPG, on the one hand, and the Associations, on the other. The district

court's opinion on remand now informs us that discovery was begun and basically continued in the state court action—in which there was no dispute concerning the jurisdiction of the court over the fraud and breach of fiduciary duty claims—with the understanding that the state court discovery would or could be used in the federal court action. We are also advised that, in response to mutual document requests, plaintiffs produced over 4,000 pages of documents and defendants over 100,000 pages of documents, of which plaintiffs made copies of over 65,000 pages. 588 F.Supp. at 1049–50 & n. 1. Depositions were also taken by both plaintiffs and defendants from January 1979 through mid-May 1980, with some 66 days of testimony resulting in 11,850 pages of transcript and "numerous disputes during the discovery resulting in applications to the state court." *Id.* at 1050. Meanwhile, defendants filed a motion to dismiss the federal complaint, claiming that the action was barred by section 2(b) of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) (1982) (concerning applicability of the Sherman Act, Clayton Act, and Federal Trade Commission Act to insurance business), and that the plaintiffs lacked standing. This motion was never decided, despite the quantity of material submitted to the court, because by the spring of 1980 serious settlement negotiations were taking place, and by mid-June of 1980 the parties had requested the federal court to withhold decision. *Id.*

Meanwhile, in February 1979, the Associations had passed a series of resolutions—in essence, to discontinue their endorsement of certain CPG products other than group health insurance, to accept general advertising, to study other insurance programs, to negotiate with CPG relative to membership maintenance and processing, and to consider the possibility of phasing out the Associations' group health insurance program (run by CPG). On September 1, 1980, the Associations signed an agreement with CPG, the substance of which is set forth in our previous opinion, 706 F.2d at 429. The agreement essential-

ly provided for a termination of the relationship between the Associations and CPG as well as elimination of CPG's control over the Associations' membership lists and exclusive right to advertise in Association publications. The agreement also provided for payment of some $6.86 million from CPG to the Associations, and an agreement by CPG to spend an additional $4.5 million to promote membership in the Associations between January 1, 1980, and June 30, 1981. On November 6, 1980, the parties in the federal and state actions stipulated to a proposed settlement, which essentially incorporated the terms of the September 1980 voluntary agreement among the defendants. The proposed settlement did, however, add certain terms regarding (1) competitive bidding procedures for the placement of insurance by the Associations; (2) termination of the state and federal actions; (3) broadening of the plaintiff class to include all persons who were members of the Associations as of November 1, 1980, thereby increasing the class membership to over 11,000,000 persons; (4) class notification of the settlement and state court hearing through the Associations' news bulletins and magazines; (5) attorneys' fees, as will be set forth below; and (6) an escape clause for the defendants in the event that more than 10,000 class members were to opt out or if the settlement were disapproved by either the state supreme or federal district court or upon any appeal from either of such courts. *See id.* at 429–30. The district court now advises us, 588 F.Supp. at 1052, that 2,850 persons have opted out of the class while 11 have objected to the settlement.

The appellants objecting to the settlement are the same persons who previously objected—including Harriet Miller, the former executive director of the Associations, who played an instrumental role in bringing about the disassociation of CPG and the Associations, as well as the Mountain Plains Congress of Senior Organizations. They now urge that the district court erred and violated this court's mandate by granting renewed approval to the proposed settlement without allowing discovery and without conducting an evidentiary hearing. They contend that the settlement does not fall within a range of fairness reflecting adequacy of representation and that the district court made errors of law as well as incorrect assumptions regarding matters of fact. They object to approval of the attorneys' fees and conclude generally that the proposed settlement is contrary to the interests of the class, being "all cost and no benefit."

DISCUSSION

We begin with appellants' procedural objections. Their point is that the district court granted approval on remand without allowing discovery and without conducting an evidentiary hearing. Our prior opinion referred to the fact that the district court had "stated conclusions but made no specific findings" and that we could not properly review the settlement "because we do not have sufficient analysis of several pivotal issues." 706 F.2d at 427. We said that we could not "intelligently review the settlement on this record," *id.* at 433, and that while the district judge was entitled to rely on pertinent portions of the state court referee's report as to reasonableness, "his reliance could not substitute for federal court inquiry as to matters pertinent to the federal suit that were either not considered or inadequately considered by the referee." *Id.* at 434. Judge Newman, concurring, supported "our call for further analysis." *Id.* at 436.

At the same time, we said that we did not expect a district judge to "convert settlement hearings into mini-trials on the merits," *id.* at 433, and that no further evidentiary hearing would be necessary unless the objectors raised "cogent factual objections to the settlement," *id.* at 434 (quoting *Weinberger v. Kendrick,* 698 F.2d 61, 79 (2d Cir.1982), *cert. denied,* — U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983)); *see also City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 464 (2d Cir.1974) (*Grinnell I*) (objectors must make "clear and specific showing that vital material was ignored by the District Court"). Thus we did not re-

quire that the district court open the case for further discovery and an evidentiary hearing unless the district court found that the objectors raised "cogent factual objections to the settlement." Whether such objections were raised can only be determined by reviewing the individual issues on which we asked for further analysis.

1. *Adequacy of class representation.* The first issue remanded for findings is whether the named plaintiffs were fair and adequate representatives for both the class of insurance buyers they purported to represent at the time suit was brought and the broadened class ultimately approved by the district court. Fed.R.Civ.P. 23(a)(4). In the district court, the objectors sought discovery as to "[t]he relationships of named-plaintiffs to counsel, and other information bearing upon adequacy of their representation of absentee class members." Discovery was denied by the district court, which instead proceeded on the theory, citing *Fischer v. ITT,* 72 F.R.D. 170, 173 (E.D.N.Y.1976), that "the 'touchstone' for denial of class action status was the question of whether the plaintiff had an interest in the attorney's fee," and that as "a matter of common experience in class actions," it is the attorneys and not the class plaintiffs "who make the litigation decisions, determine strategy, and negotiate settlement terms." 588 F.Supp. at 1057–58. The district court, attesting to "the high professional character of [plaintiffs' attorneys'] work," found that the class was represented by attorneys who had "acted with outstanding vigor and dedication." *Id.* at 1058.

On first impression, the district court's denial of discovery appears in conflict with the spirit of our remand, where we pointed out that "[a] judge has an obligation to consider whether the interests of the class are adequately represented" and that he or she "must examine the quality of representation with particular care where, as here, a class is sought to be broadly expanded after the litigation has been in process and for purposes of settlement." 706 F.2d at 433. Moreover, in this case an initial impression of impropriety in regard to class representation seems difficult to avoid; as we also pointed out, plaintiff Malchman is the brother of class counsel; plaintiff Conway is the sister of the chauffeur of class counsel; plaintiff Lederer was the mother-in-law of class counsel; and plaintiff Stone is a personal friend of class counsel. *Id.* at 432.

It appears now, however, that before settlement negotiations began, defendants had deposed the named plaintiffs at length on issues that included the ties between the named plaintiffs and class counsel; plaintiff Deutriell had been deposed for three days, resulting in 611 pages of transcript; plaintiff Louis Stone had also been deposed for three days, resulting in 399 pages of transcript; plaintiff Conway had been deposed for three days, resulting in 380 pages of transcript; and Joseph Stone, a plaintiff in the state court (but not the federal court) action, had been deposed at comparable length on two days. Our perusal of these depositions, transcripts of which were handed to us at argument, demonstrates to us that the defendants' questioning of plaintiffs was searching, strenuous, and conducted at arm's length— as evidence by the acerbic interchanges among the parties' counsel and the deponents.

Joseph Stone, a man of impressive credentials,[1] was, if anything, a fiercely independent plaintiff. After reading articles about group health insurance in Consumer Reports and Forbes Magazine, an article about Leonard Davis in the Washington Post, and a "Sixty Minutes" transcript on CPG and the Associations, he formed the impression that Leonard Davis handpicked the members of the Associations' board. At one point, while under examination by counsel for CPG and Leonard Davis, he suggested to counsel "that you do not be-

---

**1.** Mr. Stone is a lawyer and sometime consumer advocate who formerly served as Assistant District Attorney in New York County, Chief of the Criminal Court Bureau of that office and Judge of the Criminal Court of the City of New York.

come antagonistic. You do not raise your voice to me at any time. Witnesses, like everybody else, have rights, and I will not tolerate any nonsense on your part. You just ask the questions and I will answer them."

Plaintiff Deautriell apparently had learned about the Lederer case from objector Harriet Miller, whom he had called in reference to the Washington Post article. Deautriell was to obtain from the Lederers what was then the name of co-counsel for plaintiffs, Kaufman, Taylor, Kimmel & Miller (now Kaufman Malchman & Kirby). He became a plaintiff after learning for himself about the nature of the suit; there is no indication that he was solicited in any manner, shape or form.

Plaintiff Louis Stone wrote an investment letter for the firm then known as Shearson, Hayden & Stone, for whom he was a registered representative and vice president. According to Stone's deposition, in June 1978, Stone had lunch with his friend, Stanley L. Kaufman, counsel for plaintiff Lederer. Following the luncheon, over which the litigation was discussed, Stone volunteered to become a plaintiff "as a representative policy holder and as a social-minded participant in so-called benefits of this hospitalization plan for older people ... in an inflating society who are subject to the hazards of sickness and old age without adequate incomes currently." Stone testified without hesitation that it was he who first raised the subject of his becoming a plaintiff. He, too, had some feisty words for defendants' counsel: "The objective here, it seems to me, is not to ascertain the truth of the facts, the objective is to discredit me as a plaintiff or as a witness and I wish you would state this objective and, of course, you don't." As he went on to say, "[a]nd although I don't hold myself out as one of nature's noblemen, I think that I have a duty as a citizen to help in the prosecution of evil."

Plaintiff Conway has worked full- and part-time for Social Concern Housekeeping Vendor Agency for some six years. Her late brother, Alvin Curley, had been a chauffeur for Milton Gould, of what was then Shea, Gould, Climenko & Casey (now Shea & Gould), and had "overheard a conversation that Shea Gould was involved in a lawsuit against AARP and Colonial Penn." Her brother asked her if she wanted to join in. After that conversation, she received a call from one of the Shea, Gould lawyers, but she testified unequivocally that no lawyer had asked her to become a plaintiff in this action.

■ Appellants argue that the district court did not make an independent examination of the relationship between counsel and the named plaintiffs. While we think the district court's treatment of the adequacy of representation was somewhat limited, *cf. Susman v. Lincoln American Corp.*, 561 F.2d 86, 90–94 (7th Cir.1977) (setting forth extensive analysis of adequacy of representation problems where named plaintiff related to plaintiff's counsel), our examination of the depositions indicates that the plaintiffs—particularly Joseph Stone, a plaintiff in the state court proceeding—were quite appropriate, perhaps even zealous members of the class. Moreover, as the brief of the plaintiffs-appellees points out, appellants failed to specify a single question that would have improved upon the defendants' searching depositions of the plaintiffs. Certainly in respect to the dual issues of representation and solicitation, appellants have furnished no "cogent factual objections" indicating the need for discovery or possible evidentiary hearing. *See Weinberger*, 698 F.2d at 79.

■ In the end, the question whether named plaintiffs are adequate class representatives is one committed to the sound discretion of the district court.[2] *See In-*

---

**2.** It is because of, not despite, our belief in deference to the discretion of the district court that we have referred to the record in explanation of the district court that we have referred

to the record in explanation of the district court's finding that class representation was adequate, given the district court's rather sketchy treatment of client-counsel relations that many,

*gram v. Madison Square Center, Inc.,* 709 F.2d 807, 811 (2d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 346, 78 L.Ed.2d 313 (1983); *Brick v. CPC International, Inc.,* 547 F.2d 185, 187 (2d Cir.1976). Moreover, there is nothing to indicate, as the district court demonstrated, 588 F.Supp. at 1058, that expanding the originally defined class to include all AARP members, including those who had not purchased CPG insurance, and all members of NRTA and of Action for an Independent Maturity (AIM), a division of AARP, somehow made the original plaintiffs incapable of representing the class. To be sure, the class was apparently expanded to give defendants maximum protection against further litigation. But the district court found this to be a reasonable objective. *Id.* Furthermore, the interests of the members of AARP who purchased insurance are not antagonistic to the interests of the AARP members who have not purchased insurance, since all benefited from having the opportunity to purchase insurance from a carrier selected by competitive bidding as well as from the reorganization of the Associations' structure—the reform of advertising policy, the separation from CPG, and the termination of the Associations' promotion of CPG's non-health insurance projects. In short, the interests of the members of the broadened class in the settlement agreement were commonly held, and there is therefore no basis for disturbing the district court's finding on adequacy of representation.

2. *Adequacy, fairness, and reasonableness of the settlement.* The second major issue is the adequacy, fairness, and reasonableness of the settlement. *See, e.g., Weinberger,* 698 F.2d at 73; *Plummer v. Chemical Bank,* 668 F.2d 654, 659 (2d Cir. 1982). We have gained much from the district court's opinion, as well as from the briefs and record furnished to us on this appeal, and may now compare the substantive terms of the settlement to the likely result of a trial, *Protective Committee for Independent Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968); *accord In re Traffic Executive Association-Eastern Railroads,* 627 F.2d 631, 633 (2d Cir.1980). and examine the negotiating process for evidence of coercion or collusion. *Weinberger,* 698 F.2d at 74; *Robertson v. National Basketball Association,* 556 F.2d 682, 684 n. 1 (2d Cir. 1977); *Grinnell I,* 495 F.2d at 465.

■ On comparing the possible results of a trial to the terms of the settlement, the key issue from a federal-court point of view is, as it always has been, the viability of a claim for damages by the plaintiff class under the antitrust laws. No such claim was made; our question on the previous appeal was whether one should have been, 706 F.2d at 435. We note at the outset that the principal question does not, perhaps, concern liability itself but rather remedy. We say this, because the prospect of liability under federal antitrust law was at least a factor in inducing defendants to acquiesce in what amounts to substantial injunctive relief *in exchange* for the foreclosure to class members of claims for relief in damages. We say "perhaps," however, because the McCarron-Ferguson defense, *see supra* at 3747, was still outstanding at the time of settlement. But the main question concerns the role that a potential claim for damages relief did play or should have played in the litigation strategy of class counsel.

As the district court correctly observed, in order to obtain relief in damages, class members must prove "injury in fact," *see J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787, 791–92 (5th Cir.1983), by way of demonstrating that the insurance purchased from the defendant insurance companies either cost more or was of less value than insurance otherwise available to them absent the alleged anticompetitive activity. Even though the aggregated damages, as appellants point out, might be enormous,

---

at first glance, would find suspect. *Cf. Susman,* 561 F.2d at 93 (noting that "the notion that the appearance of conduct is as important as the

conduct itself is a predicate for the Code of Professional Responsibility").

establishing individual damages would very likely require numerous subclasses. This is true since there were some seventeen different AARP plans and nine NRTA plans in effect during the relevant period from 1973 to 1980, 588 F.Supp. at 1054, and a method would have been required to compare the particular mix of premiums and benefits in each plan with the premiums and benefits that a claimant hypothetically would have paid or received in the absence of alleged antitrust violations. Our previous opinion noted that "means may be available to assess the harm to the class even if proof of each plaintiff's damages would be difficult," 706 F.2d at 435, and the district court apparently misinterpreted this to suggest, contrary to *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1017 (2d Cir.1973), *vacated and remanded*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), that the claims of the various subclasses could be treated collectively as the claim of "the class as a whole." *Eisen*, 479 F.2d at 1014, 1018; *accord In re Hotel Telephone Charges*, 500 F.2d 86, 90 (9th Cir.1974). What we referred to as "means" were computer programs that would simplify the proof of damages of subclasses. But apparently suggestions as to these were not forthcoming from the objectors on remand—not in their "offer of proof," made when it was evident that the district court was going to deny an evidentiary hearing, nor in their reply brief on appeal, from which we view the lame statement that "space does not permit us to respond to

appellees' assertions that the damage claims were not viable" as evidence to the contrary. Appellants rely on *Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785, 823 (2d Cir. 1983), *cert. denied,* — U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), and other antitrust and damage cases that have adopted the elasticity theory of *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); such cases, however, involve damages not to a multimillion member class but to either a single individual plaintiff or a relatively small class of plaintiffs. In sum, and largely because appellants have not argued convincingly to the contrary, we must agree with the district court's treatment of the alleged $200 million loss to the class as a whole, as well as the $39 million loss to policyholders that is drawn from a comparison of the loss ratio implemented by the Associations' current carrier to the loss ratio used by CPG, *see* 588 F.Supp. at 1056–57.[3]

We also referred to the possibility of derivative damages, specifically in terms of the "over $19 million" in advertising revenues it is estimated the Associations will obtain from other advertisers "in the next five years alone." 706 F.2d at 435. The district court thought this derivative claim worthless, since N.Y. Not-for-Profit Corp. Law § 623(a) (McKinney 1970) requires that such an action be brought by at least five percent of any class of members.

**3.** We find, however, not altogether irrefutable the district court's conclusion that comparing loss ratios could not serve as a method of determining damages in this case. Prudential's willingness to utilize a loss ratio over 14% lower than CPG's average previous loss ratio obviously reflects a commitment prospective in nature, and to that extent is irrelevant to proof of damages here. It is possible, however, that the Prudential loss ratio was not determined whimsically but was projected from data that would form much of the factual basis for the antitrust claims at issue here. A demonstration, however, of the extent to which Prudential's determination of a loss ratio might reveal a method of structuring what to lay persons seems an intimidating mass of data was a task for appellants, not the district court—a task appellants

failed to perform. We emphasize the difference between supporting a claim for the relevance of data and supporting a claim on the basis of specific data. Because appellants failed to do the former, the district court was well within its discretion to discount the prospect of the latter.

Similarly, we can agree with the district court that a theory of unjust enrichment is inappropriate in proving damages for an antitrust violation, 588 F.Supp. at 1056–57, without rejecting the possibility that, as in *Zeller v. Bogue Elec. Mfg. Co.*, 476 F.2d 795, 802 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), CPG's excess gain might be found the most effective way to measure plaintiffs' loss. But appellants' inability to justify advancing litigation to a stage where that issue would emerge makes the point moot.

This analysis is incorrect; since the Associations are concededly District of Columbia nonprofit corporations, District of Columbia law controls the maintenance of any derivative action, *see Abramowitz v. Posner*, 513 F.Supp. 120, 126 (S.D.N.Y.1981), *aff'd*, 672 F.2d 1025 (2d Cir.1982); *see generally* 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1826, at 328 (1972), and apparently contains no such limitation.

Significantly, however, neither below nor on this appeal have appellants advanced any data that would lead us to think that an assertion of this derivative claim could be litigated successfully; appellants have failed to utilize the opportunity afforded by this court's previous remand to produce "cogent factual objections" to the foreclosure of derivative damages claims on behalf of the Associations. However tantalizing the prospect of a derivative claim for lost revenues may be when expressed as a generality, in the absence of data articulating the claim with specificity, the district court's approval of a settlement foreclosing to class members the right to bring a derivative action must be affirmed.[4]

In doing so, we note that the very nature of a derivative claim largely mitigates whatever threat may be posed by the settlement's foreclosure of the right of class members to bring a claim on behalf of the Associations against the defendants because the nearly 3,000 members of the Associations who have opted out of the current lawsuit remain eligible to vindicate injury suffered by the Associations as a result of defendants' alleged illegalities, notwithstanding the district court's approval of the settlement. It is perhaps significant, however, that as yet no one has attempted such a derivative action.

■ Finally, we called on the district court to examine *Copitka v. Colonial Penn Group, Inc.*, No. 442574 (Cal.Super.Ct. San Diego Cty.1979), a case settled for $500,000 in the heat of the publicity surrounding the soon-to-be-terminated relationship between CPG and the Associations. We agree that the case is irrelevant to the issues in this federal antitrust action.

■ Finding no viable federal antitrust claim for damages is not, of course, to say that there is no state claim for fraud or breach of fiduciary duty of sufficient viability to render unfair and unreasonable a settlement foreclosing such a claim. That determination, of course, is a matter for the state court, which has yet finally to act. The parties' settlement is conditioned upon approval of both the state court and the federal court, so that our judgment affirming approval of the settlement is necessarily subject to the state court's approval but we make it so subject, in any event.

■ The second factor that we asked the district court to examine is "the negotiating process, examined in the light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." 706 F.2d at 433. The district court's analysis of these issues on remand is somewhat unresponsive. Although, as previously mentioned, the district court attests "to the high professional character of [plaintiffs' attorneys'] work," adding that "[t]here has never been the slightest hint in the conduct of plaintiffs' attorneys that they were willing to sacrifice legitimate claims for an easy settlement," 588 F.Supp. at 1058, we had hoped for more analysis, especially given the tem-

---

**4.** In light of Judge Mansfield's vigorous dissenting opinion, we wish to make it clear that we view the viability of class claims for damages solely from the standpoint that they are claims for federal antitrust violations and lost advertising revenues. As such for damage purposes we agree with the district judge that the claims had no viability and rather than be "potentially worth many millions of dollars," as Judge Mansfield suggests, and as our first opinion thought possible, it had no worth. This is not to express any opinion on the value, if any, of the state claims, as we say in the text at 3761. Moreover, it is not as if no monetary recovery were obtained in the settlement; as we pointed out, CPG agreed in the "voluntary" agreement of September 1980 to pay the Associations a total of $6.86 million and to spend an additional $4.5 million to promote membership in the Associations.

poral relationship between the agreement reached among the defendants in September 1980 and the stipulation of settlement reached among the defendants and plaintiffs two months later. For although in one sense we might agree with the district court that "there was no 'rapid agreement in principle,'" and "[t]he chronology of the litigation makes this clear," *id.* at 1060, it is precisely the chronology of the litigation that calls into question the vigor and dedication of class representations. For on the basis of chronology alone, it appears, to say the least, that the settlement adds very little to the benefits obtained for the plaintiffs as a result of the voluntary agreement reached in September 1980. Put another way, given only the chronology of this litigation, one might ask, as on the previous appeal we did ask, why the plaintiffs did not simply withdraw their complaints after having obtained, in the agreement of September 1980, substantially all the relief that their litigation in state and federal court sought. On first impression, chronology alone suggests that after the agreement of September 1980, the negotiations leading to the stipulation of settlement amounted to little more than a trade of damages relief foreclosure for attorneys' fees.

Despite the limited assistance from the district court, however, we have been enlightened by the briefs and record on appeal. They indicate an early fruitless round of settlement negotiations in 1979, at which time the Associations began to change the structure of its ties to CPG in a manner directly responsive to allegations made in the state and federal court complaints. Of course, as the objectors suggested in their offer of proof to the district court, no one can be certain whether the decision to separate the Associations from CPG stemmed principally from this lawsuit, or from the pendency of other litigation coupled with investigations by the United States Postal Service and the Securities and Exchange Commission, or from what appellants have termed "a deluge of attendant unfavorable publicity." We do know, however, that this litigation commenced and was proceeding at pace with the development of the record to which we have alluded above—a significant fact, since it is immaterial as a matter of law whether there were factors involved in the agreement of September 1980 other than the lawsuit. One never can tell the exact motivations of the parties in reaching a voluntary agreement, but it is apparent that we were under a misimpression that the issues addressed in the lawsuit settlement, because resolved subsequent in time to the voluntary agreement, were not a causative factor or a catalyst in bringing about the voluntary agreement. The likelihood that the voluntary agreement might have followed logically, if not chronologically, from litigation directed toward a judicially imposed resolution of the dispute cannot be overlooked, since it is clear that the Associations on the one hand and Leonard Davis and CPG and related companies on the other desired to forestall further unfavorable publicity by "voluntary" agreement.

Of most importance, the district court has made a finding not only that "there was a long and conscientious struggle by the attorneys for both plaintiffs and defendants to achieve an honorable and realistic disposition of this important case," 588 F.Supp. at 1061, but that "[t]he attack mounted by plaintiffs succeeded" as "[f]ew class actions have ever succeeded in altering commercial relationships of such magnitude," *id.* at 1052. On this record, we cannot say that these findings are clearly erroneous, nor do we think it would be prudent judicial administration to remand for further findings in this respect. The experience of counsel and the vigor with which the case was in fact prosecuted indicate that the negotiation process in general was aboveboard, at arm's length, and non-collusive. And once we treat the agreement of September 1980 as caused in substantial part by the suit(s), we cannot ignore the fact that under the "voluntary" agreement of September 1980 CPG agreed to pay the Associations a total of $6.86 million and to spend an additional $4.5 mil-

lion to promote membership in the Associations between January 1, 1980, and June 30, 1981, in addition to its various other agreements relative to disassociation. Eleven million dollars is no small sum.

■ We come finally to the point that, unfortunately perhaps, constitutes the principal thrust of this appeal, namely, that the attorneys' fees agreed upon in the settlement were negotiated simultaneously with issues on the merits, thereby tainting the settlement. *Cf. Barnett v. Pritzker*, 73 F.R.D. 430, 432 (S.D.N.Y.1977) (viewing class action defendant's presettlement arrangement to pay plaintiff's attorneys' fees in a definite amount as potentially collusive); *City of Philadelphia v. Chas. Pfizer & Co.*, 345 F.Supp. 454, 471 (S.D.N.Y.1972) (expressing concern over simultaneous negotiations for class members and fees). *See generally Developments in the Law— Class Actions*, 89 Harv.L.Rev. 1318, 1608 & n. 132 (1976). Appellants argue further that long after agreement on fees had been reached there were settlement drafts and correspondence indicating that negotiations were continuing. And they emphasize that they pressed without success for discovery in this area following remand by this court to the district court. Appellees, in response, assert that fees were discussed only after a "framework of settlement" on the merits had been agreed upon, and that documents in the state court proceeding— now a part of the record in this case on appeal—are sufficient to support this position without additional discovery.

The key to appellants' claims are statements made to the state court referee by Mr. Rosdeitcher, counsel for CPG, that fees had been discussed during the course of the settlement discussions. Mr. Rosdeitcher, when asked how the number of $2.325 million came about, testified that:

This was a negotiated figure. During the course of the settlement discussions we were asked whether, among other things, as part of the settlement, we would agree not to oppose a fee of a certain size. And various numbers I can't remember the progression of the numbers, various numbers were discussed.

When asked over what period of time the negotiations took place, Mr. Rosdeitcher responded, "I would say there were two periods ... of settlement discussion." He then stated that the first discussion of settlement, which included discussion about both the entire settlement and the entire counsel fees, occurred in 1979, when evidently a claim was made for $4 million in attorneys' fees. Under further questioning, Mr. Rosdeitcher testified that in early 1980, CPG would probably not have opposed a sum of $1 million, while the other side was talking about $4 million. He testified before the referee that "through the period in early 1980, we came to an agreement as to the number we would not oppose." Appellants claim that such testimony proves the occurrence of a simultaneous discussion of merits and fees sufficient to taint the entire settlement.

Appellees' response is that, when read in context, Mr. Rosdeitcher's testimony does not support appellants' claim. Referring to a transcript of the hearing before the referee, appellees point out that during an early round of settlement negotiations in 1979, defendants were asked whether they would agree not to oppose a fee of $4 million. The CPG people responded that they would not accept any such proposal, whereupon the discussions broke off. In the latter part of 1979 and continuing on into 1980, settlement discussions began anew and a framework of settlement was agreed upon orally. Furthermore, in an affidavit submitted to the state court and now included in our record on appeal, counsel for CPG states that only after the merits of the settlement were accepted in principle did CPG enter into negotiations concerning the maximum fee that it would not oppose, and only at the conclusion of those negotiations did it agree to accept a fee application not in excess of $2.325 million. Affidavits filed in the state court on behalf of the Association and the plaintiffs support the CPG statement—in effect, that only certain minutiae were left for resolu-

tion after the matters in principle had been agreed to. The district court, viewing these averments "in light of all the circumstances," said that they appear "entirely credible." 588 F.Supp. at 1061.

We agree. This and other courts have previously expressed concern over the award of attorneys' fees in class action settlements. *See, e.g., Prandini v. National Tea Co.,* 557 F.2d 1015, 1020–21 (3d Cir.1977); *Grinnell I,* 495 F.2d at 468–74. Sharing this concern, we nevertheless find no reason to disturb the district court's determination that the conduct of the parties leading to agreement on attorneys' fees was proper. Here, in contrast to the circumstances in *Prandini,* there is no issue involving allocation of a fund between class damages and attorneys' fees or even a separate award. Instead, the discussion concerned the payment of attorneys' fees alone, presumably in anticipation of the "relief" that plaintiffs would obtain as a result of defendants' agreement of September 1980. Also in contrast to *Prandini,* the course of negotiations on the settlement in general reflects the absence of a "sweetheart" relationship between negotiating parties, as evidenced by the combativeness of deposition testimony, *see supra* at 898–899, and by the averment, *supra* at 904, that the earlier fee negotiations

broke off when plaintiffs pressed for a fee considered to be too high. Moreover, as the court in *Prandini* recognized, "with the increasingly heavy burden upon the courts, settlements of disputes must be encouraged." 557 F.2d at 1021. Absent special circumstances, such as those in *Prandini,* the negotiation of attorneys' fees cannot be excluded from this principle. *See White v. New Hampshire Department of Employment Security,* 455 U.S. 445, 453 n. 15, 102 S.Ct. 1162, 1167 n. 15, 71 L.Ed.2d 325 (1982); *cf. Shlensky v. Dorsey,* 574 F.2d 131, 150 (3d Cir.1978) (refusing to require that approval of damage aspect of settlement precede consideration of attorneys' fees). We do not find such special circumstances here.[5]

■ Two remaining questions may be dealt with summarily. First, should the Associations, which are indeed made up of the members of the plaintiff class, be required to pay any part of the settlement?[6] 706 F.2d at 436. Second, why was a bonus awarded "regardless of the difficulty of the tasks performed"?[7] *Id.* at 435. The district court answered the first question affirmatively, stating that, it being "settled law that attorneys' fees may be charged against the beneficiary of a class action ...

---

5. It may be, as Judge Mansfield suggests, that it would be wise not to have the subject of attorneys' fees agreed upon but "be left to the court for determination after its independent review and approval of a settlement...." (dissenting op., at 909). But where, as here, the amount of the fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. It is difficult to see how this could be left entirely to the court for determination after the settlement.

I note with interest Judge Newman's doubts about a defendant's "clear sailing" clause and the distinction that he draws between such a clause and a plaintiff's "ceiling" clause. In my view, as a practical matter, I believe it a distinction without a difference.

6. According to the terms of the settlement, the defendants are not to oppose plaintiffs' application for attorneys' fees and expenses not in

excess of $2.325 million. Of those fees and expenses not in excess of $1 million, CPG is to pay 90% and the Associations the remaining 10%. Of any fees and expenses in excess of $1 million, CPG is to pay 70% and the Associations the remaining 30%. The plaintiffs did in fact apply to the state court referee, as well as to the district court, for the full $2.325 million, and both the referee and the district court approved the application, the district court approving the application again on remand, 588 F.Supp. at 1061.

7. In the previous appeal, we incorrectly describe the magnitude of the bonus approved by the referee and the district court as applying a multiplier of two to the average hourly rate of $120. The district court informs us, 588 F.Supp. at 1059, that a multiplier of 1.685 more accurately reflects the bonus over the average hourly rate, given the 10,282.75 hours submitted by plaintiffs' co-counsel to justify an application for $2,085,901 in fees.

[the Associations'] agreement to a modest contribution toward the attorneys' fees was entirely reasonable and lawful." 588 F.Supp. at 1061.

On further consideration, we agree. The similarity between this case and *Shlensky,* 574 F.2d at 150, is instructive. In *Shlensky,* plaintiffs' derivative action on behalf of the Gulf Oil Corporation sought, inter alia, recovery of corporate funds illegally expended in certain election campaigns. The parties agreed to a stipulated settlement that included an agreement by Gulf to reimburse plaintiffs' attorneys and accountants for up to $600,000 in fees and $25,000 in expenses. On appeal from the district court's approval of the settlement, the Third Circuit rejected the objector's claim that Gulf's agreement to pay plaintiffs' fees and expenses contributed to a settlement that was unfair and unreasonable because Gulf would be left without a net benefit. In so doing, the court found nothing improper in Gulf's agreement to pay fees and expenses totaling $625,000, where as a result of the settlement Gulf's monetary benefit alone would total $2,875,-000.

Here, as in *Shlensky,* a party purportedly harmed by defendants' allegedly illegal conduct agreed to pay a part of plaintiffs' attorneys' fees. In *Shlensky,* the court found reasonable Gulf's assumption of $650,000 in plaintiffs' fees and expenses in light of Gulf's net gain of $2,875,000 from the settlement. *Id.* Here, where the Associations' contribution of several hundred thousand dollars to plaintiffs' fees and expenses is part of a settlement whereby CPG will pay to or spend on behalf of the Associations a total of over $11 million, *see supra* at 903–904, the contribution is a fortiori reasonable.

■ Moreover, the settlement brings to the Associations substantial nonmonetary benefits; it is quite evident from the affidavit filed by Cyril F. Brickfield, the Executive Director of the Associations and a party defendant to this action, that the Associations were desirous of ending the litigation as well as terminating the relationship with CPG, because it was interfering with the conduct of business of the Associations, was a cloud on their reputations and was discouraging voluntary service leaders as well as professional staff. The Brickfield affidavit points out that without the Associations' participation in the fee provision an agreement would not have been reached; and had the agreement failed, the Associations would have been faced with legal fees in further defense of the suit, as well as the other costs inherent in litigation. We think that these considerations justify the payment of fees by the Associations, but not with the bonus multiplier that was applied by the district court; we therefore reduce the attorneys' fees payable by the Association to $252,683.[8]

For the reasons stated in the district court opinion, 588 F.Supp. at 1059–60, we agree that the award of attorneys' fees and costs may otherwise stand.

Settlement as modified approved, subject to approval of the state Supreme Court in *Conway v. Davis.* No costs to any party.

JON O. NEWMAN, Circuit Judge, concurring:

I concur in Judge Oakes' comprehensive opinion and write these additional words only to express a caution concerning the continued use in settlements of a "clear sailing" clause whereby a defendant agrees not to challenge a plaintiff's request for attorney's fees up to a stipulated amount.

It has long been recognized that any agreement concerning plaintiff's attorney's fees, entered into in the course of settling

---

**8.** We arrive at this figure by calculating, according to the agreed upon contribution formula, *supra* note 4, the Associations' share of plaintiffs' requested fee of $2,085,901 to be $425,700, and then reducing it by a divisor of 1.685. Because CPG's contribution is, of course, unaffected by the elimination of the multiplier as applied to the Associations' contribution, the effect of the foregoing modification is a reduction of plaintiffs' fee award from $2,085,901 to $1,912,-814. The net result is that CPG's contribution to plaintiffs' fees remains at $1,660,131, while the Associations' contribution is reduced to $252,-683.

litigation, poses a danger of pitting the interests of the plaintiff in receiving a recovery against the interests of the plaintiff's attorney in receiving a fee. The tension between their interests exists even in the garden-variety tort cases in which the attorney has an agreement to receive a contingency fee at a stated fraction of the recovery. The attorney, anxious to assure himself a fee, may urge a settlement at a low figure, contrary to the position of the plaintiff, who might be willing to take the risk of no recovery for the chance to win a larger recovery. Or the plaintiff may be anxious to assure himself a recovery and therefore favor settlement at a low figure, contrary to the position of his attorney, who might be willing to take the risk of receiving no fee for the chance to win a larger fee based on a larger recovery.

These potential conflicts between a plaintiff and his attorney arise in the context of cases proposed to be settled for a cash payment from the defendant, out of which the plaintiff's attorney receives a fee. In that context, the defendant is indifferent to the amount of the fee that results from an allocation of the payment between the plaintiff and the plaintiff's attorney. The defendant's interest is in knowing his total exposure.

However, the defendant's interest in ascertaining the amount of the fee of the plaintiff's attorney vitally affects the settlement of cases like the present one in which the settlement does not provide a fund but calls only for injunctive relief, and the plaintiff's attorney is entitled to a fee for having conferred a benefit upon the members of the class.[1] In this circumstance, the defendant is entitled to know the limit of his total exposure, and, as the Supreme Court has recognized, it is unrealistic to expect him to agree to a settlement concerning the injunction terms until he knows the limit of his exposure for the attorney's fees. *See White v. New Hampshire Dep't of Employment Security,* 455

U.S. 445, 453–54 n. 15, 102 S.Ct. 1162, 1167–68 n. 15, 71 L.Ed.2d 325 (1982); *see also* A. Miller, *Attorneys' Fees in Class Actions, A Report to the Federal Judicial Center* 219 (1980). The settlement terms that benefit the plaintiff class all have a cost to the defendant, and the defendant will be more likely to settle when a limit upon all his costs has been determined. Thus, settlements are promoted by permitting the parties to a class action to negotiate a ceiling on the amount of attorney's fees that the plaintiffs will seek.

However, a *plaintiff's* agreement not to seek attorney's fees above a stipulated ceiling must be distinguished from a *defendant's* agreement not to contest an application for fees up to the amount of that ceiling. The two agreements differ in fundamental respects. The negotiated ceiling restricts the plaintiff; the "clear sailing" clause restricts the defendant. When only a "ceiling" clause is used, though the plaintiff will almost always make a claim equal to the amount of the ceiling, the figure awarded by the court will not necessarily be so high and may frequently be considerably less; the defendant has a strong incentive to persuade the court to award some figure below the ceiling, since it will save from its anticipated maximum exposure any dollar below the ceiling that is not awarded in fees. But when a "clear sailing" clause is used and the fee application is not challenged by the defendant, the figure allowed by a trial court will tend to be very close to, and frequently precisely at, the negotiated ceiling, as occurred in this case.

A "clear sailing" clause has two adverse effects that cast substantial doubt on the legitimacy of its use. First, it deprives the trial court and a reviewing court of the certainty of having the propriety of the fee request tested in the adversary process. Sometimes, as in this case, objectors will come forward to challenge the reasonable-

---

**1.** The defendant would also want to ascertain the amount of the plaintiff's attorney's fee in the settlement of any case in which the plaintiff, whether or not representing a class, is entitled to recover an attorney's fee by virtue of a statute authorizing an attorney's fee to the prevailing party. *See, e.g.,* 42 U.S.C. § 1988 (1982).

ness of the attorney's fee claimed by the plaintiffs, even when the fee is within the negotiated ceiling. But a "clear sailing" clause creates the risk that a fee request within the negotiated ceiling will not be challenged, placing upon the courts the burden of examining the basis for the fee, unaided by the challenges of an adverse party. *See Prandini v. National Tea Co.,* 557 F.2d 1015, 1020–21 (3d Cir.1977); *Foster v. Boise-Cascade, Inc.,* 420 F.Supp. 674, 678, 689 n. 8 (S.D.Tex.1976) (agreed upon fee), *aff'd,* 577 F.2d 335 (5th Cir.1978) (per curiam). Second, the clause creates the likelihood that plaintiffs' counsel, in obtaining the defendant's agreement not to challenge a fee request within a stated ceiling, will bargain away something of value to the plaintiff class. It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a "clear sailing" clause without obtaining something in return. That something will normally be at the expense of the plaintiff class. *See* A. Miller, *supra,* at 219–20.

An agreement whereby the plaintiffs agree to place a limit on the amount of attorney's fees to be sought does not encounter similar objections. The amount of the fee ultimately allowed always remains subject to the adversary process. Moreover, the agreement not to seek fees above a stated sum represents a concession on the part of the plaintiffs and their counsel, rather than a benefit for which the defendant may expect something in return.[2]

In future cases it may be well to scrutinize carefully the use of "clear sailing" clauses. Perhaps they should be forbidden in all cases. Since the parties in this case had no reason to doubt the propriety of agreeing to the clause, I do not object to its use in this case.

**2.** At least this is so whenever the plaintiffs propose a fee ceiling that they will not exceed, and the defendant gladly agrees to incorporate this assurance into the proposed settlement. The risk that a defendant will extract a concession from the class is also normally absent when the defendant holds out for a fee ceiling lower than that initially proposed by the plaintiffs. Perhaps, in some instances of the latter type, a defendant, bargaining about the fee ceiling,

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent. In my view the proposed settlement is tainted by the simultaneously-negotiated agreement by the defendants not to oppose their paying $2,325,000 to class counsel. This amounts to an average of at least $203 per hour for every lawyer, no matter how junior, who worked on the case, plus costs and disbursements. I find it difficult to believe that this huge sum could not have improperly tempted class counsel to give up class claims potentially worth many millions of dollars rather than carry on the fight to enforce those claims or negotiate a more advantageous settlement for the class members. Certainly class counsel should bear the heavy burden of proving that they were not so improperly influenced. I do not believe that this burden has thus far been sustained. As the guardian of 11.2 million absent class members unable to protect their own interests, *see National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9, 20 (2d Cir.1981), we should not approve the settlement or the fees until they have done so.

What may be good for class counsel may not necessarily be in the best interests of the class. Although an agreement by defendants "not to oppose" a $2,325,000 fee to plaintiffs' counsel does not technically bind the court, it is naive not to recognize that as a practical matter it constitutes a joint invitation by the parties to the court to award the specified upper limit since the defendants, not the members of the class, would pay the agreed-upon fee and the payment would be in addition to the defendants' commitments under the main settlement. The defendants' interest in learn-

might suggest its willingness to accept a ceiling closer to the plaintiffs' demand if the plaintiffs will surrender some benefit unrelated to the fee. The occasional occurrence of this sort of bargaining about the amount of the ceiling is far less troublesome than the negotiation of a "clear sailing" clause, which always confers a benefit upon the plaintiffs and their counsel for which the defendant will always be tempted to demand something in return.

ing of their total potential exposure could be satisfied by their obtaining from the class counsel, before joining in a submission of the proposed agreement on the merits to the court for approval, a statement of the fee that the class would seek to have approved and fixed by the court. If that proposed fee figure appeared to the defendants to be excessive they would remain free to withdraw completely from the settlement or to oppose the class counsel's fee application. Advance fee agreements, however, such as the one presently before us, should be abolished since they promote a potential abuse of trust and conflict of interest on the part of class counsel.

For these reasons the amount of the fee should in my view be left to the court for determination after its independent review and approval of a settlement, governed by the factors outlined in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974); *Lindy Bros. v. American Radiator*, 487 F.2d 161 (3d Cir. 1973). Included among the factors to be considered, of course, are the degree of risk incurred by class counsel and whether it justifies a risk premium.[1] The objective should be to compensate class counsel adequately and at the same time not unreasonably reduce the recovery and relief to be gained for the class. However, as Judge Oakes recognized in asking the district court in his earlier opinion, *Malchman v. Davis*, 706 F.2d 426, 436 (2d Cir.1983), to explain whether "the fees [were] agreed upon before the settlement was reached or only after substantive issues were worked out," simultaneous negotiation of attorney's fees and settlement terms poses the serious danger of collusion, *i.e.*, that plaintiffs' counsel will give up potentially valuable client's rights in return for non-opposi-

tion to fees higher than those that might otherwise be awarded. *See Barnett v. Pritzker*, 73 F.R.D. 430 (S.D.N.Y.1977); *City of Philadelphia v. Chas. Pfizer & Co.*, 345 F.Supp. 454, 471 (S.D.N.Y.1972). That danger is great in the present case for the reason that we are dealing with the release of claims for very large amounts of money.

The district court, after characterizing as "realistic" and unchallenged an estimate that "individual damage recoveries would likely be less than $100" (which could result in a recovery of up to $250,000,000) estimated that if the plaintiffs could prove that they would have been able to purchase insurance from another company at 10% less than the premiums charged by Colonial Penn Group (CPG), the savings, after trebling, would be $32.40 per year per person for the 2.5 million members of the class who purchased insurance. This would amount to a potential recovery of $80,000,000 per year. Even if, allowing for the risks and difficulties in proof described by the court, the recovery were cut by 50% it would be $40,000,000 per year for a period of up to seven years. To prepare and try damage claims to completion would be costly and involve substantial risk for plaintiffs' counsel. On the other hand, the settlement, under which the defendants agreed not to oppose $2,325,000 for class counsel's legal fees, assures the latter a virtually riskless award of a very substantial amount for their services. This tantalizing prospect can tempt class counsel, consciously or not, to agree to settlement terms that are less favorable to their clients than would otherwise be the case.

The majority and Judge Griesa, relying on conclusory statements made in counsels' affidavits, have proceeded on the erroneous assumption that class counsel's attorney's fees were not negotiated until after the substantive terms of the main settlement

---

1. In the present case, for instance, the court would also take into consideration the defendants' adoption in February 1979 of some salutory provisions beneficial to the class, which possibly had the effect of assuring class counsel that they were likely in any event to receive some award from the court. As the district court noted, "the vigorous prosecution of these lawsuits was the principal cause, if not the sole cause, of the revisions in practice carried out by the Associations commencing in February 1979."

were agreed upon and that the settlement was therefore not tainted by the agreement on class counsel's attorney's fees. The record before the state court Referee (which Judge Griesa apparently did not examine) strongly supports an inference that only after plaintiffs' counsel were assured of nonopposition by the defendants to their $2,325,000 fee application (originally class counsel demanded $4,500,000) did they surrender their clients' potential recovery of $40–$80 million per year.

In a hearing on January 9, 1981, only two months after the settlement was reduced to writing and signed by the parties, Mr. Rosdeitcher, CPG's counsel, was asked by Referee Johnson, "[h]ow did the number of $2.325 million [maximum legal fees] come about?" Rosdeitcher replied that it was a "negotiated figure" arrived at during the "settlement discussions ... as part of the settlement." [2] He stated that in February 1979 (when settlement of the case was initiated and long before terms were agreed upon) counsel for the parties, including himself, discussed "both the form of a settlement" and "whether we [defendants] would be agreeable not to oppose a certain fee application." (Suppl.App. 4).[3] At this early stage plaintiffs' counsel, Mr. Lesch, asked the defendants whether they would agree not to oppose an application by the plaintiffs for an attorney's fee of approxi-

---

**2.** "THE REFEREE: Mr. Rosditcher [sic throughout transcript], how did this number come about, is what I would like to know? How did the number of 2.325 million come about? Where did that come from?

"MR. ROSDITCHER: This was a negotiated figure. *During the course of the settlement discussions, we were asked whether, among other things, as part of the settlement, we would agree not to oppose a fee of a certain size. And various numbers, I can't remember the progression of the numbers, but various numbers were discussed.*

"THE REFEREE: Who discussed them, if I may ask?

"MR. ROSDITCHER: I discussed them with Mr. Lesch. Mr. Kalmus discussed them with Mr. Lesch. Mr. Malchman and Mr. Kaufman, I believe, were also involved in discussions. Mr. Belnick was involved in discussions. And a partner of mine, Arthur Kalish, and at one point, one of my senior partners, Morris Abram, had been in one early discussion." (Suppl.App. 2–3). (Emphasis supplied).

**3.** "THE REFEREE: How long did these negotiations or discussions ensue? Over what period of time?

"MR. ROSDITCHER: I would say there were two periods, and correct me if my memory is inaccurate, there were two periods of settlement discussion.

There was a period which went back, I suppose, to, was it late 1978?

"MR. BELNICK: Yes.

"MR. LESCH: *In about February, 1979.*

"MR. KALMUS: Which came to nothing.

"MR. ROSDITCHER: *Which was the first discussion of settlement. It was at that time—*

"THE REFEREE: *Settlement with reference to the counsel fees, I'm talking about specifically now.*

"MR. ROSDITCHER: *Both, the entire settlement and entire counsel fees.*

The Associations at that time had begun the process of effecting changes in the relationship and the structure of the Association, and so forth, that Mr. Lesch has been describing and described in his affidavit, at that time.

And it was about that time that settlement discussions were first raised with any seriousness.

My recollection is that at times, people have said, 'Is there any basis for settlement?' But it was nothing worth describing here.

*And at that time [early 1979] we discussed both the form of a settlement and the question of fee was raised, as to whether we would be agreeable not to oppose a certain fee application.*

Now, I don't recall what amount was proposed. I believe that it was certainly in excess of the 2.3 million.

"MR. LESCH: So the record is clear,—

"THE REFEREE: Let Mr. Rosditcher state it, and then you may have the opportunity.

"MR. LESCH: Excuse me.

"THE REFEREE: After Mr. Rosditcher, Mr. Kalmus will state it, and you will state it and anyone else.

Go ahead.

"MR. ROSDITCHER: My recollection is there was an initial figure which was substantially in excess of 2.325 million dollars mentioned.

"THE REFEREE: Which was it, approximately?

"MR. ROSDITCHER: Which was approximately $4 million.

"THE REFEREE: When you say mentioned, mentioned by whom?

"MR. ROSDITCHER: Mentioned by plaintiffs' counsel.

"MR. LESCH: *So the record is clear, you are talking about 1980?*

"MR. ROSDITCHER: *No, talking about 1979."* (Suppl.App. 3–5). (Emphasis supplied).

mately $4.5 million,[4] but the CPG and Association defendants were unwilling to agree to such a large amount. Settlement negotiations were then suspended, according to Messrs. Kalmus and Rosdeitcher, who proposed "in early 1980" that the fee be limited to $1 million.[5] Out of these negotiations, which began in 1979 with class counsel initially asking $4,500,000 and defendants starting with $1,000,000, came the figure of $2,325,000 which, according to defense counsel, constituted part of a "framework of settlement" agreed to orally in June of 1980.

Defendants now contend that their early discussions, in which class counsel asked for a $4,500,000 fee and the defense re-

4. "MR. LESCH: ....

First, on the question of fee negotiations, I do not believe that Mr. Fischman ever mentioned the figure of $4 million.

What I believe happened was that benefits were discussed. And that in the context of the quantification of benefits, the inference was drawn that Mr. Fischman was talking about a fee of $4 million.

My understanding is that the first time that that figure was mentioned occurred in negotiations between, and I don't believe it was 4 million, I believe that the number I mentioned was somewhat in excess of 4 million.

"MR. KALMUS: I believe it was. 4½.

"MR. ROSDITCHER: I think Mr. Lesch is correct in the way I first got the 4 million.

"MR. KALMUS: I would concur with Mr. Lesch.

"MR. ROSDITCHER: I derived the inference from the benefits they were describing.

"MR. LESCH: *And that then we got into the negotiations and we started with the figure in excess of 4 million, and they started with a figure substantially below 2.325 million dollars.*" (Rev. Suppl.App. 17–18). (Emphasis supplied).

5. "MR. ROSDITCHER: And we indicated, that is, the CPG and the Association defendants as well, we would not be agreeable to an agreement which said we would not oppose such a fee.

"THE REFEREE: Such a fee of $4 million?

"MR. ROSDITCHER: Yes.

"THE REFEREE: Very well. But did you come back with a counter-proposal with reference to the—

"MR. ROSDITCHER: Not at that time, I think our feeling was it was too high, and didn't come back with any approval.

I think at some point, shortly after those talks began, that is, within a month or two, they ended, and we then proceeded to full activity.

I think things got wound up and we went through a lot of discovery after that.

The next period that I recall, the time is collapsing here.

"THE REFEREE: I realize that.

"MR. ROSDITCHER: Was it early in 1980 we began again?

"MR. KALMUS: In the latter part of 1979.

"MR. ROSDITCHER: The latter part of 1979, yes.

"MR. KALMUS: I first had some discussions then. I and Mr. Oberman, my partner, had discussions with Mr. Lesch and his partner, Mr. Fischman. And at times, with Mr. Malchman and Mr. Kaufman as well.

"THE REFEREE: With reference to counsel's fees?

"MR. KALMUS: No, not specifically; with reference to the possibility of settling the litigation either with the AARP defendants alone or the entire litigation as to everyone.

Those discussions began in late 1979, continued into 1980, on and off, with adversary discovery going on concurrently.

In due course, in the early spring, I would say, of 1980, or perhaps late winter of 1980, that is to say, a little less than a year ago, those discussions led to discussions in which Colonial Penn counsel, Mr. Rosditcher and his partner, Mr. Kalish, were also involved, *that went on back and forth over an extended period of time into June of 1980.*

*At that time, a framework of a settlement was agreed upon orally. That framework included an understanding that the defendants would not oppose an application for counsel fees up to $2.325 million, inclusive of disbursements.*

And from June through into the autumn of last year [1980], we worked on the details of a settlement agreement which resulted in the settlement agreement that you have before you dated November 3, 1980.

"THE REFEREE: Is that substantially what occurred, Mr. Rosditcher?

"MR. ROSDITCHER: That is substantially what occurred.

Just to add to something that I said earlier, I do not recall that you asked how we got to this number.

"THE REFEREE: Yes.

"MR. ROSDITCHER: And I do recall that Mr. Lesch, I believe it was, told us precisely what he believed the total hours spent by his firm and the Kaufman firm were worth. *And I believe the number mentioned at that time, this was probably in early 1980, was a million dollars.*

He also felt that the benefits he conferred justified a substantial multiple of that number.

And I think that we then started—said 4 million, and we said, 'No, that is too high.'

And somehow, *through the period in early 1980, we came to an agreement as to the number we would not oppose.*" (Suppl.App. 6–9). (Emphasis supplied).

sponded with an offer not to oppose a $1,000,000 fee, should not be considered by us since the parties failed to reach a settlement agreement with respect to the class' claims and discussions then ended, not to be resumed until some time in 1980. If, as defense counsel now concede, it would be improper to discuss class counsel's legal fees until the framework of a settlement of the class claims had been agreed upon and if, as they now aver, there was no discussion of the $2,325,000 legal fee until such an agreement was reached in the latter part of 1980, how do they justify the *earlier* fee discussions which admittedly took place *before* any settlement with respect to the substantive issues was reached? The answer is that the parties *were* discussing the amount of class counsel's legal fee (i.e., $4,500,000 versus $1,000,000 maximum) *before* any agreement on the class' claims was arrived at and, to use Mr. Rosdeitcher's words, the $2,325,000 figure "was a negotiated figure," arrived at "[d]uring the course of the settlement discussions ... as part of the settlement." See *footnote 2, supra.*

Thus, according to the January 9, 1981, record before Referee Johnson, which was much closer to the events in question than today, the parties acknowledged that they had agreed, long before the terms of the settlement had firmly been reached, that the $4.5 million attorney's fee limit originally sought by plaintiffs' counsel would be reduced to $2,325,000 and that this figure would not be opposed by the defendants. Against this background it is beyond dispute that the parties did not agree upon the terms of the settlement itself (as distinguished from the amount of counsel fees) until September 1980 and that no written agreement was signed until November 3, 1980. Until the latter date plaintiffs were as a practical matter not legally bound to surrender their damage claims potentially worth many millions of dollars.

From the foregoing record of the hearing before Referee Johnson, in which lead counsel for all major parties participated, it is difficult not to conclude that plaintiffs' counsel were unwilling to give the class'

damage claims of some $40–$80 million per year until they were firmly assured that there would be no opposition to their proposed $2,325,000 in legal fees. But, regardless whether one accepts this inference, the record certainly dictates a more searching inquiry than that made by Judge Griesa.

In my view such an inquiry is mandated by other surrounding circumstances as well. The lead plaintiff, Nathan Malchman (whose deposition was never taken), is the brother of Irving Malchman, legal counsel for the class. One of the original named plaintiffs, Frieda Lederer, was Irving Malchman's mother-in-law. Greta Conway is the sister of the chauffeur for class counsel. Louis Stone is a personal friend of class counsel. All of this raises the question of whether, absent these close relationships, the named plaintiffs would not, because of their desire to see their relative or friend receive a generous share of the $2,325,000 legal fee, be much more willing to give up their potential recoveries than would the other eleven million plus members of the class who have no such relationships with class counsel.

For these reasons I would remand the case to the district court for a more searching inquiry into the reasonableness of the settlement. I would also make clear that the agreement of the defendants to pay class counsel fees up to $2,325,000 should not influence the court in any way not to disallow that amount and fix a substantially lower figure if such a figure appears to be reasonable. Indeed, the district court might test the reasonableness of the attorney's fees agreement by obtaining the benefit of the views of an independent expert or of an adversarial presentation as to the fairness of the $2,325,000 figure.